UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY BALDWIN,

Case No. 2:16-cv-13143

Plaintiff,                      District Judge Laurie J. Michelson

v.                                        Magistrate Judge Anthony P. Patti

PAUL KLEE and
DAVID MICHAEL,

Defendants.
_____/

## REPORT AND RECOMMENDATION REGARDING THE MDOC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DE 15)

I.      **RECOMMENDATION**:  The Court should grant the MDOC Defendants'

February 8, 2017 motion for summary judgment.  (DE 15.)

II.     **REPORT:**

A.      **Background**

Gary Baldwin is currently incarcerated at the MDOC's Gus Harrison

Correctional Facility (ARF) in Adrian, Michigan.  On August 30, 2016, he filed the

instant, verified civil rights complaint against six defendants.  He seeks both

punitive and compensatory damages.

Since the filing of his complaint, Plaintiff's claims against Defendants

Chapman, Siles, Leslie and Russell have been dismissed.  Thus, at this time, the

only remaining defendants are Paul Klee (described as ARF's Warden) and David Michael (described as an ARF Correctional Officer).[1]

## B.  Pending Matters

This case has been referred to me for pretrial matters.  Currently before the Court is Defendants Klee and Michael's February 8, 2017 motion for summary judgment, which primarily argues that:  **(1)** Sgt. Michael is entitled to summary judgment on the basis of Plaintiff's failure to satisfy the "subjective component" of an Eighth Amendment deliberate indifference claim; and, **(2)** Warden Klee is entitled to dismissal on the basis of Plaintiff's failure to exhaust administrative remedies as to the claims against him.  (DE 15 at 4, 9-15, 15-22.)

Plaintiff has filed a response.  (DE 16.)

## C.  Discussion

### 1.  Plaintiff has not shown that Defendant Michael was deliberately indifferent to Plaintiff's serious medical need.

#### a.  Plaintiff's allegations against Defendant Michael arguably present two theories, each of which stems from the alleged events of February 8, 2016.

##### i.  Order to walk

As previously outlined by the Court, Plaintiff has a history of treatment for his left hip, left femur and left knee.  (DE 17 at 2-3.)  Plaintiff's claims against

---

[1] The December 13, 2016 appearance of counsel lists this defendant as "David Michael" rather than "Sgt. Michaels."  (*Compare* DE 1 at 1-2, DE 10.)

Defendant Michael stem from the alleged events of February 8, 2016, when Plaintiff claims he "was ordered to walk from [ARF's] Chow Hall while pushing his damaged wheelchair, causing unbearable pain and damage to Plaintiff's left hip and femur." (DE 1 at 7 ¶ 1.) Although described as relating to all "Defendants," Plaintiff appears to allege that Defendant Michael "knew or should have known Plaintiff's inability to ambulate great distances without the use of [his] wheelchair would cause him severe pain and physical damage[,]" and "knew or should have known" of Plaintiff's "permanent wheelchair detail." (DE 1 at 7 ¶¶ 2, 6; *see also* DE 1 at 12.) Plaintiff also contends that Defendant Michael ordered Plaintiff "to walk to Unit 3 without providing reasonable care and attention to his damaged wheelchair." (DE 1 at 8 ¶ 4; *see also* DE 1 at 8 ¶ 7.)

### ii. Wheelchair repair

According to Plaintiff, the wheelchair was "inoperable," and he has suffered "severe pain in [his] left hip and femur from being ordered to walk . . . ." (DE 1 at 8 ¶¶ 8, 6.)

### b. Plaintiff initiated Grievance Identifier ARF-2016-02-0378-17z during February 2016, touching upon both of these theories.

On February 8, 2016, Plaintiff completed a Step I grievance form, contending that he "[t]alk[ed] to [Sgt.] Michaels about a Medical Emergency[,]" and providing the following detail:

> I came in the chow hall while having problems with a bearing in my wheelchair. I couldn't move my chair because [a] bearing went out & I needed to go to medical to get a replacement so I could get around in the institution. *The Sarge told me to get out & push it back to the unit[.]* []I have a permanent wheelchair accommodation[,] because . . . my left hip does have an implant & has been out of place. Now [I am] in a lot of pain because of walking from the chow hall & back to the Unit. [Sgt. Michaels] claimed that us []inmates took the wheel off & took a bushing out[.] How[?] [W]e [cannot] even use a screw driver to tighten up screws on a pair of glasses. To me *Sargent Michaels [is not] a mechani[c]* when he tells me in front of other inmates that he can tighten up a self tighting [sic] nut with his hand & without wrenches. . . . Plus the bearing was hanging in plain sight.[]

The grievance was received at Step I on February 10, 2016. (DE 1 at 11-12 (italics added) (underscoring in original).)

On or about April 5, 2016, Plaintiff completed a Step II grievance appeal form. It was received at Step II on April 8, 2016. (DE 1 at 13.) Plaintiff claims he did so because "Defendants failed to answer Step I grievance in a timely manner in violation of Administrative Rules." (DE 1 at 8 ¶ 5.) ARF Deputy Warden Willis Chapman responded approximately one week later. (DE 1 at 13-14.)

Plaintiff completed a Step III grievance appeal form, which appears to have been received on April 21, 2016. (DE 1 at 13.) In a decision dated May 18, 2016, Richard D. Russell of the MDOC Office of Legal Affairs denied the Step III appeal. (DE 1 at 15; *see also* DE 1 ¶ 9.)

Oddly, the Step I grievance response by Sgt. Leslie, which was reviewed by Lt. D. Siles, is dated June 12, 2016 – a date *after* the Step III grievance response.

Among other things, the investigation revealed that "Prisoner Baldwin was not

having a medical emergency, he was having an issue with his wheelchair." (DE 1

at 16; *see also* DE 1 ¶ 10.) The MDOC Defendants acknowledge that "it appears

that Baldwin exhausted his administrative remedies as to Sergeant Michael[.]"

(DE 15 at 14.)[2]

> ### c. Plaintiff's "Staff Misconduct Report & Complaint" is dated May 13, 2016.

---

[2] In addition, Plaintiff seems to take issue with Defendant Michael's participation
in an interview by now-dismissed Defendant Leslie, which lead to the June 12,
2016 Step I grievance response that "Sgt. Michael did not deny Prisoner Baldwin a
right to medical care during a medical emergency[.]" (DE 1 at 9 ¶¶ 10-11, DE 1 at
16.) Furthermore, Plaintiff seems to claim this "review" effected the April 13,
2016 Step II grievance response and the May 18, 2016 Step III response. (DE 1 at
9 ¶ 11, DE 1 at 14-15.) In his response to the instant motion, Plaintiff contends
that "there was no reason for Defendant Sgt. Michael to be present . . ." at the June
12, 2016 hearing and suggests it was "an obvious attempt to intimidate Plaintiff."
(DE 16 at 2 ¶ D.)

However, as noted elsewhere in this report and recommendation, the Step I
response is dated June 12, 2016, and Plaintiff's response to the instant motion
contends the "hearing" occurred the same day. (*See* DE 16 at 2 ¶ D.) Therefore, it
is not clear how Defendant Michael's participation in the June 12, 2016 proceeding
could have had an influence on the earlier-dated grievance appeal responses.
Moreover, having only cited the First and Eighth Amendments within his
complaint, it does not appear that Plaintiff intended to allege some type of
Fourteenth Amendment procedural due process claim concerning Defendants'
execution of the MDOC's Grievance Procedure. (*See* DE 1 at 7 ¶ 1, DE 1 at 9 ¶¶
11-12.) This is unchanged by Plaintiff's response that the June 12, 2016 hearing
on ARF-16-02-0378-17z, or the processing of same, was a "sham proceeding,"
(DE 16 at 2 ¶ D, DE 16 at 3 ¶ 1), as "[t]he well-pleaded complaint rule recognizes
that the plaintiff is the master of his complaint." *Roddy v. Grand Trunk W. R.R.
Inc.*, 395 F.3d 318, 322 (6th Cir. 2005) (citation omitted). Thus, the Court looks to
Plaintiff's complaint to define his claims.

Meanwhile, on or about May 13, 2016 - while Plaintiff was awaiting his Step III grievance response and before he had received the Step I grievance response - Plaintiff completed a "Staff Misconduct Report & Complaint" against "Sgt. Michael" alleging "Conduct Unbecoming a State Employee." (DE 1 at 21-22.) On or about July 13, 2016, Plaintiff sent a follow up letter regarding his "Civil Service Complaint," wherein he claimed that ARF Warden Klee is retaliating against him. (DE 1 at 23.)

> ### d. Plaintiff's Eighth Amendment claim against Defendant Michael requires a showing of objective and subjective elements.

"The Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs . . . ." *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008). "A constitutional claim for deliberate indifference to serious medical needs requires a showing of objective and subjective components." *Phillips*, 534 F.3d at 539. As the Supreme Court has instructed in *Farmer v. Brennan*, 511 U.S. 825 (1994):

> It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met. *First*, the deprivation alleged must be, objectively, "sufficiently serious," . . . ; a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities," . . . . For a claim (like the one here) based on a

failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. . . .

The *second* requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." . . . To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." . . . In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety, . . . a standard the parties agree governs the claim in this case.

*Farmer*, 511 U.S. at 834 (internal footnote and internal citations omitted). The Court then went on to set forth the test for deliberate indifference:

. . . a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and *disregards* an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . But an official's failure to alleviate a significant risk that he *should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837–838 (emphasis added). "[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment." *Id.* at 839–840.

> e. **As to his two theories, Plaintiff has not satisfied the subjective element of "deliberate indifference" to his assumed serious medical need.**

Defendant Michael assumes, for purposes of his motion only, that "Baldwin's need involved a serious medical condition." (DE 15 at 17.) I do likewise. Thus, the issue before the Court is whether Plaintiff has shown evidence of the second or subjective prong, *i.e.*, that Defendant Michael was *deliberately indifferent* to a serious medical need. The Court should find that Plaintiff has not.

### i. Evidence

The parties have submitted competing statements. Defendants offer the February 7, 2017 affidavit of Defendant Michael. Of particular import are his following attestations:

- On February 8, 2016, during evening chow, Baldwin approached me complaining about a wobbly wheel on his wheelchair.

- Baldwin had been assigned a prisoner aide to push his wheelchair. Because Baldwin and his aide had used his wheelchair to get from his housing unit to the chow hall, I looked at the wheelchair to see if anything was broken.

- The wheelchair was pushed back and forth and in a large circle. While it appeared that a bushing was missing from one of the wheels, Baldwin's wheelchair was operating properly. I never observed any of the wheels wobble and believed that with the assistance of his prisoner aide, Baldwin could safely use his current wheelchair.

- I did not believe that there was any chance th[at] using the wheelchair would present a danger to Baldwin.

- Normally, I speak with someone in Healthcare in this type of situation or call the Unit Officer to make sure the prisoner

would have an opportunity to see Healthcare should the problem persistent [sic]. Although I have a vague memory of speaking with someone regarding this incident, I do not presently recall the identity of that individual.

(DE 15-4 ¶¶ 5-9.)

In addition to his verified complaint, Plaintiff provides the February 12, 2016 declaration of Bertram Scott (#200602), who identifies himself as a "Geriatric Porter" at ARF. Prisoner Scott claims he was pushing Plaintiff on the evening of February 8, 2016 "when the right rear wheel bearing went completely out and [I] was unable to push inmate from the chow-hall." (DE 16 at 8.) Scott then gives the following version of the events of February 8, 2016:

> After eating[,] we went to Sgt[.] Mich[ae]l and told him that inmate Baldwin needed to go to Healthcare to get a temporary wheelchair since his wheelchair bearing went out and we were next door to Healthcare.
>
> Sgt. Mich[ae]l then told Baldwin to get out of the wheelchair and stand up so he could look at it. He then tried to tighten up a self tight[en]ing nut, without tools.
>
> He got mad and gave inmate a Direct order to walk the wheelchair back to the Unit and "Let them do the paperwork." The wheelchair is for long distance. Inmate Baldwin had to stop many times to rest before getting to the Unit. I had to wait approxim[ate]ly half [an] hour to three quarters of an hour to get a tempora[r]y wheelchair for inmate Baldwin.

*Id.*

Moreover, the record contains excerpts of Plaintiff's MDOC Health Care Records from 2012 through 2016.  (*See* DE 1 at 12, 17-20; DE 15-5.)  These will be discussed below, as necessary.

### ii.    **Wheelchair repair**

To the extent Plaintiff's verified complaint takes issue with the operability of his wheelchair and Defendant Michael's failure to provide "reasonable care and attention to his damaged wheelchair[,]" (*see* DE 1 ¶ 4; *see also* DE 1 ¶¶ 4, 8), Plaintiff has not shown that Defendant Michael was deliberately indifferent to any need to repair it.

To be sure, there is a dispute as to the operability of the wheelchair.  As previously stated, Defendant attested that Plaintiff and his aid "had used [the] wheelchair to get from his housing unit to the chow hall[.]"  (DE 15-4 at 3 ¶ 6.) Defendant further attests:  "it appeared that a bushing was missing from one of the wheels," "Baldwin's wheelchair was operating properly[,]" and "I never observed any of the wheels wobble . . . ."  (DE 15-4 at 3 ¶ 7.)  On the other hand, Prisoner Scott declares that he pushed Plaintiff to the dining hall between 7:00 p.m. and 7:30 p.m., when "the right rear wheel bearing went completely out and [he] was *unable to push* [Plaintiff] from the chow-hall."  (DE 16 at 8 (emphases added).)

However, as Defendants point out, "[w]hile Plaintiff suffers from mobility issues, his concerns were not *disregarded* by Sgt. Michael[,]" who "ma[d]e a

professional judgment based on his inspection of the wheelchair." (DE 15 at 20-21 (emphasis added).) Stated otherwise, "Sgt. Michael listened to Baldwin's concerns, inspected his wheelchair and found it to be operable." (DE 15 at 22.)

In fact, Plaintiff's own unverified response buttresses the conclusion that the wheelchair repair claim against Defendant Michael does not rise to the level of deliberate indifference. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Specifically:

> . . . a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Roland v. Johnson,* 856 F.2d 764, 769-770 (6th Cir. 1988) (applying this standard to determine whether behavior amounted to "a deliberate indifference to the plaintiff's safety"); *Horn by Parks v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) ("the conduct for which liability attaches must be more culpable than mere negligence[.]").

Plaintiff's un-verified response sounds in terms of negligence. Plaintiff takes issue with Defendant Michael's "examination of the wheelchair without a certificate in maintenance repair[,]" calling into question Defendant Michael's "subjective belief [that the] wheelchair was operable . . . ." (DE 16 at 4-5.) Although perhaps as a retort to Defendant Michael's use of the term "professional judgment," (*see*, *e.g.*, DE 15 at 21), Plaintiff labels Defendant Michael's decision as a "'Judgment call[,]'" which Plaintiff then refers to as "the gravamen . . . of [his] injury, pain and suffering and mental distress." (DE 16 at 5.) Albeit in an unpublished opinion, the Sixth Circuit has stated that "the Eighth Amendment does not afford us the power to correct every action, statement, or attitude of a prison official with which we might disagree." *Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 WL 34677 at *3 (6th Cir. Jan. 28, 1997) (regarding verbal harassment). At best, Plaintiff has alleged that Defendant Michael failed to appreciate his need for an immediate wheelchair repair; however, this does not equate with a deliberate indifference claim.

Moreover, it does not appear that Plaintiff was left without a functioning wheelchair, as Prisoner Scott declared: "I had to wait approxim[ate]ly half [an] hour to three quarters of an hour to get a tempora[r]y wheelchair for [Plaintiff][;]" thus suggesting that Plaintiff received a temporary wheelchair that same evening. (DE 16 at 8.) *See Sadler v. Michigan Dep't of Corr.*, No. CIV.A. 09-11375, 2011

WL 2462028, at *2-*3, *5-*6 (E.D. Mich. Apr. 21, 2011) (Randon, M.J.) (where plaintiff alleged that defendant hid his wheelchair, removal of disabled prisoner's wheelchair was not deliberately indifferent where it was an "apparently isolated incident, which lasted less than an hour and was consistent with fire safety regulations . . . ."), *report and recommendation adopted sub nom. Sadler v. Monahan*, No. 09-11375, 2011 WL 2448004 (E.D. Mich. June 16, 2011) (Cohn, J.). Furthermore, the health care records attached to Defendants' motion contain a March 30, 2016 kite response from a nurse explaining that "[t]here is a new company that is doing our wheelchair repairs[.] I am working on making arrangements for them to come and repair our wheelchairs[.]" (DE 15-5 at 10-11). It does not appear that Plaintiff was left "high and dry" on the night in question or that his complaints were treated with deliberate indifference.

### iii.    Order to walk

To the extent Plaintiff's verified complaint takes issue with a February 8, 2016 order to walk from ARF's Chow Hall to Housing Unit 3 (*see* DE 1 ¶¶ 1, 4, 6, 8), and assuming Defendant Michael actually gave such an order, Plaintiff has not shown that Defendant Michael was deliberately indifferent in doing so.

As an initial matter, Defendants are not arguing that Defendant Michael, as Plaintiff hints, "was unaware that Plaintiff was impaired." (DE 16 at 4 ¶ II.) There is no dispute that Plaintiff has had a permanent wheelchair special accommodation,

as well as a special accommodation for an "[a]ttendant to assist with movement inside institution . . ." since January 17, 2014. (DE 1 at 12.) Defendants admit as much in their motion. (DE 15 at 18.) Moreover, Defendant Michael attested that "Baldwin and his aid had used his wheelchair to get from his housing unit to the chow hall," (DE 15-4 ¶ 6), which is consistent with Defendants' characterization of Plaintiff's wheelchair as "the same wheelchair he had just used to get to the chow hall . . . ." (DE 15 at 20.) Thus, there seems to be no question that Defendant Michael knew Plaintiff used a wheelchair.

In addition, there is arguably a question of fact as to whether Defendant Michael ordered Plaintiff to walk from ARF's Chow Hall back to Housing Unit 3. On this item, Defendant's affidavit is silent. This is not surprising, as Defendants' motion interprets Plaintiff's complaint as only taking issue with the deprivation of a wheelchair during that walk, not as taking issue with an order to walk. (DE 15 at 7, 18 (citing DE 1 at 8 ¶ 6.).) On the other hand, this paragraph of the complaint actually states that Plaintiff was "ordered to walk to housing Unit 3 from facility chow hall by Sgt. Michael . . . ." (DE 1 at 8 ¶ 6.) Likewise, Prisoner Scott declares that Defendant Michael told Plaintiff "*to get out of the wheelchair* and stand up so he could look at it[,]" and further "gave inmate a Direct order to walk the wheelchair back to the Unit and 'Let them do the paper work.'" (DE 16 at 8 (emphasis added).)

Plaintiff's claim that Defendant Michael ordered Plaintiff to *walk* seems implausible on this record, although the Court will treat this allegation as true, for purposes of this motion. Although Defendant Michael's affidavit is silent on this issue, he does attest that he "believed that with the assistance of his prisoner aide, Baldwin could safely use his current wheelchair[,]" and he "did not believe that there was any chance th[at] using the wheelchair would present a danger to Baldwin." (DE 15-4 at 3 ¶¶ 7-8.) Defendant Michael having attested that he believed the wheelchair to be functional, it seems unlikely he would have ordered Plaintiff to walk back to his housing unit. In addition, these attestations belie the conclusion that Defendant Michael was deliberately indifferent to Plaintiff's assumed serious medical need. Moreover, the declaration of Prisoner Scott may be internally inconsistent in that he claims he was "unable to push [Plaintiff] *from* the chow-hall[,]" but further claims that, "*[a]fter eating* we went to Sgt Mich[ae]l . . . Sgt. Mich[ae]l *then told* Baldwin *to get out of the wheelchair and stand up* so he could look at it." (DE 16 at 8 (emphases added).)

Nonetheless, even if Defendant Michael ordered Plaintiff to walk from ARF's Chow Hall back to Housing Unit 3, Plaintiff has not shown evidence of deliberate indifference. First, Plaintiff's verified complaint is couched in negligence terms, as is his non-verified response. Plaintiff repeatedly alleges that Defendants did not provide "reasonable care." (DE 1 ¶¶ 4, 7; *see also* DE 16 at 2 ¶

C.)  The emphasis on negligent conduct is further illustrated by Plaintiff's contention that Defendant Michael "knew or should have known" of Plaintiff's "inability to ambulate great distances without the use of [his] wheelchair . . .[,]" and of Plaintiff's physical impairment and permanent wheelchair detail.  (DE 1 at 7-8 ¶¶ 2, 6; *see also* DE 16 at 2, 4.)  These allegations support the notion that Plaintiff is really alleging a breach of a duty of reasonable care.

Second, although Plaintiff's complaint alleges that Defendants "knew or should have known Plaintiff's inability to ambulate great distances without the use of [his] wheelchair would cause him severe pain and physical damage[,]" (DE 1 at 7 ¶ 2), neither Plaintiff's verified complaint nor Scott's declaration illuminate the length Plaintiff was required to walk as a result of the alleged order by Defendant Michael.  It does seem undisputed that Plaintiff's wheelchair detail is related to his left hip implant, which his February 2016 grievance describes as having "been out of place."  (DE 1 at 11-12.)  However, while Scott supports Plaintiff's allegation that Defendant Michael ordered Plaintiff to walk back to the housing unit, and while Scott further declares that Plaintiff "had to stop many times to rest before getting to the Unit[,]" Scott also declares that "[t]he wheelchair is for *long distance*." (DE 16 at 8 (emphasis added)).  In addition, Plaintiff alleges that Defendants "knew or should have known Plaintiff's inability to ambulate *great distances* without the use of [his] wheelchair would cause him severe pain and

physical damage." (DE 1 at 7 ¶ 2 (emphasis added).) These statements imply that Plaintiff can walk *short distances*. In fact, the Staff Misconduct Report & Complaint attached to Plaintiff's complaint notes that the wheelchair is for "long distance," and further notes that he uses "a cane for short distance." (DE 1 at 22 ¶¶ 13, 18.) Moreover, this report and Scott's declaration describe the chow hall as being "next to" or "next door to" Healthcare (DE 1 at 22 ¶ 13, DE 16 at 8), although the exact distance from the Chow Hall to Housing Unit 3 is not clear to this Court. The quantities "short distance," "long distance," and "great distances" are hardly precise, and these terms necessarily lend themselves to varying assessments. In this context, there is no evidence to indicate that Defendant Michael ordered Plaintiff to walk a distance which Michael *subjectively knew* to be excessive in light of Plaintiff's known health restrictions, or whether Michael simply thought, rightly or wrongly, that the distance between the chow hall (or the Healthcare Unit) and the housing unit was short enough for Plaintiff to handle while walking behind his wheelchair, as opposed to sitting in it. Without more, Plaintiff has failed to show that Defendant Michael was deliberately indifferent, as opposed to having negligently made a poor judgment call.

Third, as for Plaintiff's <u>ability to stand</u>, I note that the February 20, 2016 notes from Plaintiff's nurse visit document that Plaintiff "[w]as able to get out of w/c [wheelchair], and stand on scale for wt. [weight] while leaning on the back of

another chair." (DE 15-5 at 5.) I also distinguish that the January 17, 2014 special accommodation of "no standing" relates to Plaintiff's work assignment. (DE 1 at 12.) That Plaintiff might otherwise be able to stand is consistent with: (a) his January 17, 2014 special accommodation for a wood cane; and, (b) his own May 13, 2016 statement that he uses "a cane for short distance." (DE 1 at 12, DE 1 at 22 ¶ 18.)

Plaintiff is not a paraplegic who is unable to stand or walk under any circumstances. It is undisputed that he can do both, including ambulating over short distances with support. In the end, although Plaintiff uses the phrase "deliberate indifference" in the opening paragraph of his complaint (DE 1 at 7 ¶ 1), there is no evidence in the record to support such an allegation.

### iv.   "Verifying medical evidence"

Defendants make the point that Plaintiff "has failed to place any verifying medical evidence in the record that he re-injured his surgically repair[ed] hip." (DE 15 at 21.) While "'[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed[,]'" *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (quoting *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1188 (11th Cir. 1994)), the Sixth Circuit later qualified this statement:

In sum, the "verifying medical evidence" requirement is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care. *Napier*, which was relied upon by the district court, falls within this branch of decisions. In a word, *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

*Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6th Cir. 2004) (citing *Napier,*

238 F.3d at 742).

Here, I note that all of the medical evidence attached to Plaintiff's complaint

pre-dates the events in question. (*See* DE 1 at 12, 17-20.) Moreover, Plaintiff has

not attached medical evidence to his response or either of his own motions in this

case. (*See* DEs 12, 13, 16.) His supporting witness acknowledges that the

"wheelchair is for long distance[,]" and simply states that Plaintiff "had to stop

many times to rest" on the way back to the unit, without attesting to an injury

actually caused by this event. (DE 16 at 8.) Notably, this witness makes no

observation about unbearable pain. Thus, assuming *arguendo* that Plaintiff's case

is one to which *Napier* applies, he has not shown the "detrimental effect of the

delay in medical treatment . . .[,]" *Napier*, 238 F.3d at 742.

### 2. Defendant Klee is entitled to dismissal of the claims against him.

### a. Plaintiff's allegations against Defendant Klee stem from the alleged events of June 5, 2016.

Plaintiff's claims against Defendant Klee, ARF's Warden, stem from the alleged events of June 5, 2016, when Plaintiff claims he was "accosted . . . as he was eating breakfast . . . ." Plaintiff claims Defendant Klee "took out a copy of Plaintiff's Civil Service Complaint," and stated, "'What kind of shit is this!?'" Plaintiff further claims that, on August 11, 2016, Defendant Klee intimidated Plaintiff by questioning him, showing him "a copy of a letter sent to Civil Service," and informing Plaintiff, "'They will not send you a response.'" (DE 1 at 8 ¶ 3.) In addition, Plaintiff seems to allege that Defendant Klee "failed to deliver reasonable care for injuries suffered as a result of" Defendant Michael's February 8, 2016 order. (DE 1 at 8 ¶ 4; *see also* DE 1 at 8 ¶ 7.)[3] Stated otherwise, Plaintiff

---

[3] Although Plaintiff claims that Defendants refused to provide Plaintiff with evaluation or representation by an American With Disabilities Act (ADA) representative, it is unclear against which particular defendant this claim is brought or under which section of the Act (42 U.S.C. §§ 12101-12213) this claim is based. (DE 1 at 8-9 ¶¶ 7, 12.) Even taking into consideration Plaintiff's response that Sgt. Michael "refus[ed] to allow Plaintiff to see ADA Rep. OPAL[,]" (DE 16 at 3 ¶ 4), Plaintiff's legal basis for any such claim appears to be limited to its contribution to Plaintiff's Eighth Amendment deliberate indifference claim, rather than an alleged violation of the ADA or some type of Fourteenth Amendment procedural due process claim concerning Defendants' execution of the MDOC's Grievance Procedure. (DE 1 at 8 ¶ 7.)

Moreover, it is not clear against which Defendants, if any, Plaintiff intends to bring a First Amendment retaliation claim. (*See* DE 1 at 9 ¶¶ 11, 12.) Also, even though he cites the Staff Retaliation of the MDOC Employee Handbook, it is not clear whether he intended to set forth an alleged violation of some other type of MDOC Policy Directive, such as MDOC PD 02.03.109 ("Discriminatory

claims he was "denied fair and timely treatment of injury suffered by compliance with Sgt. Michael's direct order . . . ." (DE 1 at 8 ¶ 8.)

### b. Exhaustion of administrative remedies under the PLRA

Under the PLRA, a prisoner may not bring an action "with respect to prison conditions under section 1983 of this title, or any other Federal law . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Congress enacted this provision to address the "outsized share" of prisoner litigation filings and to ensure that "the flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit." *Jones v. Bock*, 549 U.S. 199, 203-04 (2007). Put another way, the purpose of § 1997e(a) is to "reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In addition, exhaustion "gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of [the agency's] procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (internal quotations and citations omitted).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought into court." *Jones*, 549 U.S. at 211. The

---

Harassment") or MDOC PD 02.03.100 ("Employee Discipline"). (*See also* DE 16 at 9-13.)

prison's grievance process determines when a prisoner has properly exhausted his or her claim. *Id.* at 219 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."). Even where a prisoner has made some attempts to go through the prison's grievance process, "[t]he plain language of the statute makes exhaustion a precondition to filing an action in federal court." *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999). The prisoner "may not exhaust his [or her] administrative remedies during the pendency of the federal suit." *Id.* (citations omitted); *see also Woodford*, 548 US at 95 ("A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . ."). However, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216. Instead, failure to exhaust administrative remedies is an affirmative defense under the PLRA. As such, Defendants bear the burden of proof on exhaustion. *Surles v. Andison*, 678 F.3d 452, 456 (6th Cir. 2012).

### c. Plaintiff has not exhausted his administrative remedies as to his claims against Defendant Klee.

The MDOC's procedure regarding prisoner/parolee grievances is set forth at MDOC PD 03.02.130. (DE 15-2.) It is a three-step process. (*See* DE 15-2 ¶¶ V-

GG.)  Significantly, the policy provides that "[c]omplaints filed by prisoners regarding grievable issues as defined in this policy serve to exhaust a prisoner's administrative remedies only when filed as a grievance through all three steps of the grievance process in compliance with this policy."  *Id*. ¶ B.

Defendants correctly argue that Plaintiff "did not file a grievance regarding his Complaint allegations against Warden Klee." (DE 15 at 9.)  Contending that Plaintiff has only filed two Step III grievance appeals during his incarceration at ARF, Defendant correctly notes that Grievance ARF-16-02-0378-17z "does not relate to Plaintiff's remaining claims in this matter against Warden Klee." (DE 15 at 13-14, DE 15-3.)  In fact, this grievance was initiated at Step I during February 2016, a date well before the above-described events of June 2016 and August 2016.  The same is true of Grievance ARF-13-10-2980-28b, which was initiated at Step I during October 2013 and concerned an alleged October 16, 2013 robbery of certain items. (DE 15 at 14, DE 15-3 at 9-14.)  In other words, neither of these grievances was *initiated* to address Plaintiff's claims against Warden Klee, which, as discussed above, stem from the events of June and August of 2016.  Moreover, even if Plaintiff's claims against Warden Klee occurred before these dates, Plaintiff's February 8, 2016 Step I grievance in ARF-16-02-0378-17z does not mention Warden Klee. (*See* DE 1 at 11, De 15-3 at 8.)

Plaintiff's response on this issue is unavailing. For example, Plaintiff takes issue with the manner in which ARF-16-02-0378-17z was reviewed – such as by failing to timely answer his Step I grievance, which forced him to proceed to Step II, or by later conducting a "sham proceeding" at Step I on June 12, 2016; this, Plaintiff seems to argue, is contrary to MDOC PD 03.02.130 and/or Section 5 of the Employee Handbook. In fact, in an attachment to his response, Plaintiff contends that Defendant Klee retaliated "once he rec[ei]ved [the] Civil Service Complaint[,]" presumably the May 13, 2016 staff misconduct report. (DE 16 at 10, DE 1 at 21-22.) However, even if the June 12, 2016 Step I grievance response post-dated the May 18, 2016 Step III grievance appeal response, it remains that grievance ARF-16-02-0378-17z was not initiated to address Plaintiff's claims *against Defendant Klee*.

Plaintiff not having exhausted his administrative remedies as to his claims against Defendant Klee, this Defendant is entitled to dismissal.

### 3. Fed. R. Civ. P. 56(d)

The procedural history of this case warrants comment regarding the references to possible future discovery contained in Plaintiff's motion response. By way of background, on March 29, 2017, the Court denied without prejudice Plaintiff's January 24, 2017 motion to compel Defendant Michael to answer

interrogatories (Nos. 1-21), in part, because "it d[id] not appear that Plaintiff ha[d] engaged in the proper procedure for serving discovery requests."  (DE 17 at 11.)

Throughout Plaintiff's response to the instant motion are various discovery references.  For example, Plaintiff generally states that he "relies on the jury's decision after Defendants['] response to interrogatories and cross-examination." (DE 16 at 3 ¶ 3.)  As to the exhaustion issue, Plaintiff claims he will rely "on [the] jury's conclusion after hearing response under oath of Paul Klee[,]" who Plaintiff claims "has elected not to respond to interrogatories timely . . . ."  (DE 16 at 4, 7; DE 15 at 13-15.)  Also, as to the Eighth Amendment issue, Plaintiff requests "the facility video camera recordings of February 08, 2016 during time of incident of both the chow hall and front yard as material evidence in support of Plaintiff's claim[,]" and he seems to point to the aforementioned interrogatories and Defendant Michael's responses thereto, in some cases stating that he will rely upon the jury's or Court's determination on the issue examined by the interrogatory. (DE 16 at 3 ¶ 2; DE 16 at 4-5; DE 15 at 15-22.)  Then, as to qualified immunity, Plaintiff directs the Court's attention to certain interrogatory answers (which are not attached to the response) and takes issue with Defendant Michael's responses to the interrogatories, seemingly challenging the truthfulness of his answers to certain interrogatories or his assertion of a relevance objection.  (DE 16 at 5-6, DE 15 at 22-24.)  He even suggests a second set of interrogatories.  (DE 16 at 6.)

"If a nonmovant shows by affidavit or declaration that, *for specified reasons*, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d) ("When Facts Are Unavailable to the Nonmovant.") (emphasis added). Plaintiff's March 6, 2017 response is not verified or signed under penalty of perjury. Although he requests that the Court order Defendant to answer Interrogatory Nos. 17-21, he does not specify why he cannot adequately respond to Defendants' motion for summary judgment. (DE 16 at 4, 6.)[4] In addition, the witness declaration attached to his response does not satisfy Fed. R. Civ. P. 56(d). (DE 16 at 7, 8.) Therefore, the Court should not treat these allegations as invoking the procedure set forth in Rule 56(d).

### 4. Items not addressed

#### a. Qualified immunity

---

[4] Assuming Plaintiff is referring to Interrogatory Nos. 17-21 listed in his January 24, 2017 motion to compel, these interrogatories concern whether Defendant Michael was present at the June 12, 2016 hearing. (DE 13 at 3.) Despite Plaintiff's March 6, 2017 allegation that the responses to Interrogatory Nos. 17-21 were "non-responsive" and "violated the Court's Order compelling discovery[,]" (DE 16 at 5), I note that no order compelling discovery has been entered in this case.

Defendants argue that Defendant Michael is entitled to qualified immunity. (DE 15 at 22-24.) "The Court applies a three-part test when determining whether a government official is entitled to the affirmative defense of qualified immunity[:]

> The **first** inquiry is whether the Plaintiff has shown a violation of a constitutionally protected right; the **second** inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; **and** the **third** inquiry is "whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights."

*Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002) (quoting *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999)).

As discussed above, Plaintiff has failed to satisfy the first inquiry; he has not shown that Defendant Michael was deliberately indifferent to a serious medical need in contravention of the Eighth Amendment, and that appears to be the sole basis of Plaintiff's claim(s) against Defendant Michael. Therefore, the Court need not address the second and third prongs of this test and may conclude that this affirmative defense is inapplicable here.

### b.    Sovereign immunity

Plaintiff sues Defendants Klee and Michael in their personal and official capacities and seeks relief in the form of punitive and compensatory damages. (DE 1 at 1, 10.) Defendants contend they are entitled to sovereign immunity, specifically alleging:

> Defendants are employees of the State of Michigan who acted in their
> official capacities.  The State of Michigan has not consented to suit
> and Defendants enjoy sovereign immunity in their official capacities.

(DE 15 at 25.)

"Although sovereign immunity bars a § 1983 suit for monetary damages against an official in his official capacity, a state defendant can be sued in his official capacity for injunctive and declaratory relief." *Northcott v. Plunkett*, 42 F. App'x 795, 796 (6th Cir. 2002) (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10 (1989)).  However, "the sovereign-immunity doctrine does not bar [Plaintiff's] suit against [Defendant] in his individual capacity . . . or against him in his official capacity with respect to declaratory and injunctive relief . . . ." *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 765 (6th Cir. 2010) (internal citations omitted).

Here, if the Court agrees with my foregoing recommendations that Defendant Michael is entitled to summary judgment and Defendant Klee is entitled to dismissal, then the Court need not address whether any such claims are barred by sovereign immunity.

### D.    Conclusion

Plaintiff has not shown that Defendant Michael was deliberately indifferent to a serious medical need, and Plaintiff has not exhausted his administrative remedies as to his claims against Defendant Klee.  Moreover, Plaintiff has not

properly alleged that facts are unavailable to him as set forth in Fed. R. Civ. P.

56(d).  Accordingly, the Court should grant Defendant's motion for summary

judgment as to Plaintiff's claims against Defendant Michael and dismiss Plaintiff's

claims against Defendant Klee.

## III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Fed. R. Civ. P. 72(b)(2) and E.D. Mich. LR 72.1(d).  Failure to

file specific objections constitutes a waiver of any further right of appeal.  *Thomas*

*v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d

505 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others

with specificity will not preserve all the objections a party might have to this

Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d

390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d

1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections

must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," *etc.*  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.*  If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated: May 4, 2017               s/Anthony P. Patti
                                 Anthony P. Patti
                                 UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record
on May 4, 2017, electronically and/or by U.S. Mail.

                                 s/Michael Williams
                                 Case Manager for the
                                 Honorable Anthony P. Patti